UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOY WEAVER,

    *Plaintiff*,

v.

KATHLEEN MCGETTIGAN,

    *Defendant*.

Civil Action No. 1:21-cv-00304 (CJN)

**SEALED MEMORANDUM OPINION**

    Plaintiff Joy Weaver's employment at the Office of Personnel Management (OPM) was terminated after she was serially tardy for years. Weaver alleges here that the agency was required to allow her to telework as a reasonable accommodation for her disabilities, which allegedly caused her tardiness. For the reasons that follow, the Court grants OPM's motion for summary judgment.

**I.**

    1. Weaver joined OPM as a HR Specialist in 2009. Statement of Facts ("SOF") ¶ 2, ECF No. 22-1. She eventually developed a punctuality problem, and in 2016 her supervisor put her on notice that "her excessive tardiness" could result in consequences. SOF ¶ 13. Weaver nonetheless continued to miss work, "often without seeking approval." SOF ¶ 18. Between September 1, 2016 and December 8, 2016, she "was tardy on 33 of the 37 workdays she came into the office." SOF ¶ 19.

    Even after receiving warnings and suspensions, the behavior continued. SOF ¶¶ 21-31, 34. Between January 11, 2018 and April 12, 2018, for example, she was tardy on "35 of the 64 workdays." SOF ¶¶ 34, 38. Weaver was ultimately let go on February 1, 2019. SOF ¶ 35. Her

1

supervisor "noted that [Weaver] had missed several meetings, and leadership had . . . to re-delegate her workload and divert resources" as a result. SOF ¶ 39.

2. Weaver alleges that her tardiness could have been avoided had OPM allowed her to work fully remotely. In particular, she claims that the agency was obligated to allow her to telework to accommodate her "disability of anxiety and depression, which caused migraines, stress, and insomnia," SOF ¶ 42.

Weaver requested telework in July 2017 via an email to a supervisor, Andrea Bright. In the email, Weaver cited "stress and anxiety," claiming that teleworking would allow her "to work more efficiently." ECF No. 17-1 at 6; SOF ¶¶ 60, 61. Bright responded two days later asking Weaver to provide medical documentation indicating (1) "the nature, severity, and duration of [her] impairment"; (2) "the activity or activities that the impairment limits"; (3) "the extent to which the impairment limits [her] ability to perform the activity or activities; and (4) "why [she] require[s] reasonable accommodation or the particular reasonable accommodation requested, as well as how the reasonable accommodation will assist [her] in performing the essential functions of [her] job, or enjoying a benefit of the workplace." ECF No. 17-1 at 7-8; SOF ¶ 62.

Weaver did not provide the requested information, but instead claimed that her doctor "was not permitted to provide the [requested] medical documentation." SOF ¶ 63; ECF No. 17-1 at 4. Bright informed Weaver that it was in fact possible to provide the information: Bright explained that the doctor could release the information to Weaver and Weaver could provide it to the agency or Weaver could sign a "medical release form" that would "authoriz[e] the agency's physician to speak with" Weaver's doctor directly. ECF No. 17-1 at 3-4; SOF ¶ 64. Weaver responded by sending Bright a half-page letter from a social worker. SOF ¶ 65, 66; ECF No. 17-1 at 2, 17. The letter, based on four sessions that had occurred between January and March, stated that Weaver

"is under a doctor's care for depression and anxiety" and that "[d]ifficulty sleeping and concentrating are evident." ECF No. 17-1 at 17. The social worker's letter also indicated that "[c]ontributing factors include a high level of work related stress and a long commute." *Id.* The letter concluded by stating that "[e]ach session with Ms. Weaver included the same or higher levels of stress/anxiety related to being physically in the job environment." *Id.*

Bright denied Weaver's request for telework. Bright explained that Weaver's documentation did not "address how [her] medical situation limits [her] abilities or "why [her] medical situation would require [her] to telework." SOF ¶ 68. But Bright gave Weaver another chance, telling Weaver that she would "reconsider [the] request" if Weaver "provided additional medical documentation from [her] doctor." SOF ¶ 68.

More than a month later, Weaver reengaged and asked Bright to reconsider. SOF ¶ 69. Weaver provided Bright with two documents. The first was a copy of the already-provided letter from the social worker. The second was a "Request for Reasonable Accommodation" form signed by a second social worker. SOF ¶ 70. This hand-filled form left the "To what extent does the impairment limit the applicant's ability to perform the activity?" prompt blank. ECF No. 17-1 at 15. And in response to the prompt asking how "the reasonable accommodation [will] assist the applicant in performing the essential functions of the job" the social worker noted that Weaver "reported that she feels anxious during her drive into work," "overwhelmed upon arriving," and "want[s] to flee while there" before concluding that Weaver "could benefit from weekly app[ointmen]ts for symptom management." ECF No. 17-1 at 15-16.

Bright again declined to grant Weaver's request. Bright explained that the second social worker's form was not sufficient because the social worker did not "indicate[] that you are in need of full-time telework." ECF 17-1 at 9. Instead, Bright told Weaver, the "medical documentation

3

indicates that you stated that telework will support you, but it doesn't include a medical provider's statement that you require the particular accommodation of full-time telework." ECF No. 17-1 at 9; SOF ¶ 71. Still, Bright offered Weaver a third chance, telling Weaver that she would reconsider if Weaver provided the requested medical documentation. ECF No. 17-1 at 9; SOF ¶ 71.

Five days later, Weaver emailed Bright asking her to reconsider. This request included no medical documentation. ECF No. 17-1 at 8-9. Bright again explained that she needed medical documentation and gave Weaver a fourth chance to provide it. ECF No. 17-1 at 8.

Five months passed before Weaver again requested full-time telework. SOF ¶ 74. This time, she attached the same two documents from the social workers as well as a Family Medial Leave Act certification form. SOF ¶ 75. The agency submitted this request and the accompanying documentation to the agency's contract physician. SOF ¶ 76. The physician determined that he could not provide an opinion about Weaver's need for full-time telework without additional documentation. He pointed to "the lack of current medical information in the record," "no documentation from [Weaver's] treating physician," and the absence of a release form authorizing [the agency] to contact [Weaver's] health care provider." ECF No. 17-1 at 18-19. As a result, the agency denied Weaver's request. Like before, the agency told Weaver that she still had the opportunity to provide additional documentation or to sign a release form allowing the agency to contact her doctor. SOF ¶ 75.

Weaver then submitted a "Kaiser Patient Health Summary" and a "Certification Verifying Treatment" by a social worker that simply stated that "Ms. Weaver attended an appointment today." SOF ¶ 81-82; ECF No. 17-1 at 29. The agency provided these additional documents to the agency's contract physician. SOF ¶ 83. The physician again explained that he still could not

4

make a determination because of the same lack of information. ECF No. 17-1 at 33-34. The agency therefore denied Weaver's request.

A few months later, Weaver made another request for full-time telework. SOF ¶ 87. The agency employee now handling Weaver's requests, Jessica Parton, again explained to Weaver that she "need[s] to provide updated medical documentation." ECF No. 17-1 at 38. Weaver responded by providing the exact same documentation she had sent a year earlier. SOF ¶ 89. When this was pointed out, Weaver procured a new "Request for Reasonable Accommodation" form dated November 2018 from her second social worker. This hand-filled form stated that Weaver "[r]eports . . . telework has shown to support management of symptoms." ECF No. 17-1 at 40. Parton responded that the provided documentation was insufficient. SOF ¶ 90. And the agency's contract physician concurred, issuing a third determination that he could not form an opinion regarding Weaver's need to telework based on the provided documentation. SOF ¶ 97. The agency therefore denied this final request in December 2018—a couple of months before Weaver's termination.

3. After being let go, Weaver argued to the Merit Systems Protection Board that her termination was the product of disability discrimination rather than her tardiness. Ultimately, the Board disagreed, siding with the agency. SOF ¶¶ 125-128.

She then sued here, claiming that OPM discriminated against her on the basis of her disability, violating the Rehabilitation Act. Am. Compl. at ¶¶ 86-93, ECF No. 7. Her theory centers on the agency's failure to accommodate her disability by allowing her to telework. *See* Am. Compl. at ¶ 92; Pl.'s Mem. Opp. Mot. for Summ. J. ("Pl's. Br.") at 4, 5, 40, ECF No. 19.[1]

---

[1] Weaver's complaint also raised a Family Medical Leave Act claim, but she now "does not oppose the Defendant's Motion for Summary Judgment" as to that claim. Pl.'s Br. at 2 & n 1. So the Court will grant summary judgment as to that claim. It is also unclear whether Weaver raises two

## II.

1. Summary judgment is appropriate if the agency "shows that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for [Weaver].'" *Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court "may not resolve genuine disputes" in the agency's favor, *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), and Weaver's evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor," *id.* at 651 (*quoting Anderson*, 477 U.S. at 255). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. But if "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ... summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

2. Weaver's central theory is that OPM violated the Rehabilitation Act by denying her the ability to telework, which she says would have been a reasonable accommodation for her disabilities. To prevail on this failure-to-accommodate theory, Weaver "must produce sufficient evidence that (1) she was a qualified individual with a disability, (2) [OPM] had notice of her disability[,] and (3) [OPM] denied her request for a reasonable accommodation." *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014). "An employer is not required to provide an employee

---

separate disability discrimination theories—one based solely on the failure to allow her to telework and another based on the decision to terminate her because she was tardy, which was the result of the discriminatory failure to allow her to telework. In any event, both theories require Weaver to prove that the agency unlawfully denied her a reasonable accommodation, so they will be considered together.

th[e] accommodation [s]he requests or prefers[;] the employer need only provide some reasonable accommodation." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) (cleaned up).

And because "[f]ew disabilities are amenable to one-size-fits-all accommodations," to determine what accommodations are warranted, employers "need information about the nature of the individual's disability and desired accommodation—information typically possessed only by the individual or her physician." *Ward*, 762 F.3d at 31. The applicable regulations explain that to "determine the appropriate reasonable accommodation it may be necessary for the" agency "to initiate an informal, interactive process with the individual" and that this "process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3); *see also Ward*, 762 F.3d at 32; *Mogenham v. Napolitano*, 613 F.3d 1162, 1167 & n.4 (D.C. Cir. 2010).

Thus, in cases where the need for a particular accommodation "is not obvious," an employer "may require that the individual with a disability provide documentation of the need for accommodation." *Ward*, 762 F.3d at 31-32 (citation omitted). An employee fails to fulfil her role in the process—and summary judgment is appropriate—if she does not provide "the information [her employer] needed to determine the appropriate accommodation." *See id.* at 34.

That's the case here. "No reasonable juror could [find] that" OPM improperly denied Weaver's request for an accommodation because Weaver never gave OPM "the information it needed to determine the appropriate accommodation." *See Ward*, 762 F.3d at 34. OPM's actions bore many of "the hallmarks of good faith": Weaver's "supervisors promptly responded to her request for an accommodation," engaged with her requests repeatedly, "sought more information from her physician to help them determine an appropriate accommodation" and repeatedly gave her opportunities to provide the needed information. *See id.*

7

Weaver was the issue. Once OPM "set forth in writing precisely the information it needed," *Ward,* 762 F.3d at 33—medical documentation explaining her need for telework—that "put[] the burden on [Weaver] to respond." *Ali v. Pruitt*, 727 F. Appx. 692, 969 (D.C. Cir. 2018). But she never provided adequate information. That failure to comply, despite OPM sending her "several letters asking for more detailed medical information" justifies summary judgment. *See Ward*, 762 F.3d at 34.

Weaver argues that she did provide "updated, current medical documentation." Pl's. Br. at 29. While she did provide some documents touching on her disability, those documents did not "provide[] [OPM] with sufficient information to substantiate that" she "needs the reasonable accommodation requested." *Ali v. McCarthy*, 179 F. Supp. 3d 54, 79 (D.D.C. 2016). The first social worker's letter does not mention telework at all. *See supra* pp. 2-3. While it does allude to work-related stress, it does not explain how or why telework is needed to cure the problem. *Id.* The second social worker's 2017 form states that Weaver is "requesting full-time telework" and that *Weaver* "feels telework will assist her to perform her job" but never states that the *social worker* believes that telework is the proper path forward. *See supra* p. 3. To the contrary, the social worker suggested "weekly app[ointment]ts for symptom management." *Id.* And the second social worker's 2018 form did not provide an explanation from the social worker's perspective on the need for telework either; it stated that *Weaver* "[r]eports . . . telework has shown to support management of symptoms." *See id*.

Even assuming that a reasonable juror could conclude that these documents are best read as expressing the social workers' views (rather than containing the social workers' notations of Weaver's views) on the need for telework, the documents at best provide "vague recommendations," which do not suffice. *See Ali*, 727 F. Appx. at 696. Far more specific medical

8

documentation has been held insufficient. *See* Ward, 762 F.3d at 32 (medical documentation stating that the employee "would benefit from a schedule that allows her to work from home"); Ali, 727 F. Appx. at 696 (medical documentation stating that "[i]t is not practical for [the employee] to share" a workspace "otherwise his health will deteriorate" and that the employee "would do best" in a private space"). No matter how generously read, Weaver's documentation cannot be taken as containing anything more than "very general" statements and "tepid recommendation[s]." *Ali*, 179 F. Supp 3d at 68. It was therefore more than "reasonable for [OPM] to inquire" further. *Id.*

Despite the reasonableness of OPM's further inquiries, Weaver continually "failed to provide the requested information" and "refused to sign an authorization to release [her] medical information to the Agency." *Id.* at 79. "Given these roadblocks that [Weaver] erected, [s]he cannot blame the Agency for the breakdown in the interactive process," and her failure-to-accommodate claim cannot succeed. *See id.*

### III.

For the above reasons, the Court grants the motion for summary judgment. An order will be entered contemporaneously with this opinion.

DATE: August 6, 2024

_____
CARL J. NICHOLS
United States District Judge

9